**PHILADELPHIA ENTERTAINMENT AND DEVELOPMENT PARTNERS, L.P., D/B/A, Foxwoods Casino Philadelphia, Petitioners**

v.

**PENNSYLVANIA GAMING CONTROL BOARD, and Pennsylvania Gaming Control Board Bureau of Investigation and Enforcement, Respondents.**

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 2011.

Decided Nov. 10, 2011.

Stephen A. Cozen and F. Warren Jacoby, Philadelphia, for petitioners.

James J. Eisenhower, III, Philadelphia, for respondents.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge BUTLER.

Philadelphia Entertainment and Development Partners, L.P., d/b/a Foxwoods Casino Philadelphia (PEDP) petitions this Court for review of the December 23, 2010 final order of the Pennsylvania Gaming Control Board (Board) granting summary judgment in favor of the Board's Bureau of Investigation and Enforcement (BIE) and revoking PEDP's Category 2 Slot Machine License (License). The issues before this Court are: (1) whether the Board committed reversible error by applying an incorrect legal test to determine that PEDP violated conditions of its License; (2) whether the Board committed reversible error by applying an unconstitutionally vague standard of financial fitness and suitability as the basis for revoking PEDP's License; and, (3) whether the Board violated PEDP's due process rights by revoking its License *via* summary judgment without conducting an evidentiary hearing and without providing more discovery. For the reasons that follow, we affirm the Board's December 23, 2010 final order.

PEDP was formed in January of 2005 for the exclusive purpose of acquiring Delaware riverfront property in South Philadelphia and obtaining a gaming license with Foxwoods Development Company, L.L.C. (Foxwoods) and its affiliated entities to operate a slot machine facility known as Foxwoods Casino Philadelphia.[1] On December 28, 2005, PEDP applied to the Board for a Category 2 License.[2] On November 9, 2009, the Board issued a

---

1. PEDP's general partner is FDC/PEDP GP, L.L.C., which has a 0.01% ownership interest. Its limited partners are Washington Philadelphia Investors, L.P. at 70%, and Foxwoods at 29.99%. Foxwoods is owned by the Mashantucket Pequot Tribal Nation. Foxwoods Management, L.L.C. is PEDP's management company.

2. Slot machine licenses issued by the Board are categorized as either: Category 1 (licensed racetrack), Category 2 (entity not eligi-

Category 2 Background Investigation and Suitability Report for PEDP (Suitability Report) which deemed PEDP financially suitable, based upon: the Mashantucket Pequot Gaming Enterprise's low risk financial profile, a proposed $30 million in equity from Foxwoods, and a commitment letter from Merrill Lynch for sufficient funds to develop the $560 million project. A licensing hearing was held on November 14, 2006. On December 20, 2006, the Board awarded PEDP one of two Category 2 slot machine licenses available for the operation of a gaming facility in the City of Philadelphia. The Board issued the License to PEDP on May 29, 2008, subject to the condition that PEDP open its casino and begin operation of 1,500 slot machines within one year.

On May 22, 2009, however, PEDP sought an extension in which to build and open its casino, due to factors beyond its control.[3] Following a hearing, the Board determined that PEDP had good cause for an extension and, by order issued September 1, 2009, granted PEDP an extension until May 29, 2011 to open its casino, which was then the maximum extension allowable under Section 1210 of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act).[4] The September 1, 2009 order imposed nine extension conditions upon PEDP. Pursuant to Conditions 5 and 6 of the order, architectural and other construction plans, and a devel-

opment timeline were due by December 1, 2009. The order also required PEDP to submit monthly status reports to the Board, and made clear that PEDP could not change the location of its casino facility.[5] PEDP did not seek reconsideration of, or appeal, the Board's September 1, 2009 order.

On November 30, 2009, because it could not meet the Board's December 1, 2009 deadline, PEDP filed a motion with the Board for another extension, this time until at least March 1, 2010, to submit its architectural plans and development timeline as required by the September 1, 2009 order. The Board's Office of Enforcement Counsel (OEC) for BIE opposed the motion and sought imposition of a sanction against PEDP due to its lack of compliance with the Board's conditions. The Board conducted a hearing on January 27, 2010, at which PEDP's counsel stated that PEDP had been working with investment advisors to obtain financing and funding for its casino since October of 2009, at which time it realized that it would need substantial funds not then available to it. PEDP said it had distributed packets to 15 potential investors.

PEDP's counsel stated at the hearing that the delay for PEDP was due to the state of the U.S. economy, and the wait for pending table gaming legislation. PEDP's counsel represented that, as of the day of

ble for a Category 1 license with a facility in cities of the first or second class or a revenue or tourism-enhanced location) or Category 3 (established resort hotel with 275 + rooms). *See* Sections 1302 through 1305 of the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1302–1305.

3.  Philadelphia's City Council, politicians and local activist groups opposed the gaming aspect of the project, and/or the location of the casino at the Columbus Boulevard site. As a result, PEDP filed or responded to at least ten

applications before the Pennsylvania Supreme Court.

4.  4 Pa.C.S. §§ 1101–1904. After the Gaming Act's January 7, 2010 amendment, the Board could extend opening up to 36 months after the initial one-year period, or to December 31, 2012. Section 1210 of the Gaming Act, *as amended*, 4 Pa.C.S. § 1210.

5.  During the time of its difficulty with the City of Philadelphia, PEDP contemplated moving its proposed casino to a different location.

the hearing, PEDP was discussing a potential agreement with a large international investor with gaming experience, and that entity had entered into a relationship with a construction manager for the proposed project. He further stated that the design agreed upon with the potential investor will be "vastly different" from its proposed design, making another public hearing necessary. Reproduced Record (R.R.) at 1407a–1408a, 1425a, 1434a. He also stated that he did not have a date certain for the agreement in principle to be reached and, when it was reached, PEDP will likely have to return to the Board for an extension of its operation date. Finally, he stated that, if the deal with the potential investor falls through, PEDP would be back on March 1st proposing a temporary, interim, slots-only facility.

On February 10, 2010, the Board issued an order: (1) denying PEDP's motion for extension; (2) imposing a $2,000.00 per diem sanction beginning December 1, 2009 and continuing until PEDP complied with the conditions of the Board's September 1, 2009 order; and, (3) issuing a rule to show cause at a hearing on March 3, 2010 why the Board should not impose additional sanctions, including revocation, for failure to comply with the order. On February 18, 2010, PEDP agreed to a non-binding Term Sheet with Wynn Resorts Limited (Wynn) that contemplated Wynn and PEDP entering into a purchase agreement which would result in Wynn becoming a controlling owner of PEDP.

At the March 3, 2010 cause hearing, PEDP acknowledged that it had not literally complied with Conditions 5 and 6, but offered testimony and documentary evidence of its proposed deal with Wynn. PEDP's counsel explained that PEDP was not capable of developing its proposed project, and it did not have an alternate plan in place in the event Wynn backed out of the deal. Despite testimony that Wynn did not require outside financing, and that only permits and the Board's approval of Wynn as the licensee stood in its way of finalizing the deal, the Board found that PEDP had not complied with Conditions 5 and 6 of the Board's September 1, 2009 order. In addition, the Board found that PEDP's progress reports had been vague, its purported delays were no longer due to opposition to PEDP's development of the casino, and that the economic downturn could not be a new cause of delay, when the same circumstances were evident before the September 1, 2009 order was issued. Accordingly, the Board ordered that: the per diem sanctions would continue, that PEDP was to submit definitive Wynn financing documents by March 31, 2010, that PEDP was to submit architectural and other construction plans and a development timeline by April 26, 2010, and that PEDP was to report at the Board's April 29, 2010 meeting as to the need for further Board action for PEDP to achieve compliance with the Board's orders.

On March 31, 2010, copies of a partnership interest purchase agreement with Wynn were submitted to BIE, but they were unsigned. On April 2, 2010, Wynn and PEDP entered into an agreement and, on April 5, 2010, fully-signed, definitive financial documents of the transaction with Wynn were submitted to BIE. On April 6, 2010, PEDP also submitted to BIE documents in compliance with Conditions 5 and 6 of the September 1, 2009 order. On April 7, 2010, the Board's chief enforcement counsel advised the Board that PEDP had submissions in compliance with the March 3, 2010 order. On April 8, 2010, however, Wynn abruptly terminated its transaction with PEDP because the "project did not, in the end, present an opportunity that was appropriate for" Wynn.

R.R. at 4725a. On April 14, 2010, PEDP met with Board chief counsel and chief enforcement counsel and executed a consent agreement which would give PEDP an extension of time to meet requirements of the September 1, 2009 order. At its April 29, 2010 meeting, however, the Board refused to approve the consent agreement.

Also, on April 29, 2010, BIE filed a complaint seeking revocation of PEDP's license for: failure to comply with the Board's September 1, 2009 and March 3, 2010 orders (Count I), failure to comply with the Statement of Conditions to a Slot Machine License (Count II), inability to have a minimum of 1,500 slot machines available for play by May 29, 2011 (Count III), and failure to maintain suitability (Count IV). PEDP filed an answer denying BIE's allegations. PEDP also filed a motion for an extension of time to submit financing documents, architectural and other construction plans, and a development timeline, pursuant to the Board's September 1, 2009 order; and a motion to toll or extend the date to apply for a table gaming certificate and pay the application fee. The motions were consolidated.[6]

On June 18, 2010, the Board entered an order setting a discovery deadline. On October 5, 2010, BIE and PEDP filed cross-motions for summary judgment. On October 22, 2010, PEDP executed a Term Sheet with a subsidiary of Harrah's Entertainment, Inc., RBS Citizens National Association, and other parties (collectively Harrah's), for the financing, investment and management of PEDP's casino, which would be "superior to the plan that was initially contemplated," and it had Keating Building Company on board as construction manager and builder. R.R. at 4850a. Documentation purportedly memorializing the transaction was submitted to OEC on October 26, 2010, together with a request for an extension until December 31, 2012 to have 1,500 slot machines available to the public.

Oral arguments on the motions for summary judgment were held before the Board on October 27, 2010. At PEDP's urging, so that it had more time to work out its deal with Harrah's, the Board took the motions under advisement until its November 18, 2010 meeting. At the November 18, 2010 meeting, PEDP advised the Board that it was very close to concluding definitive documents with Harrah's and making necessary filings with the Board, but it was not yet final.[7] PEDP anticipated having all necessary documents filed before the Board's December 16, 2010 meeting. In light of those circumstances, PEDP asked the Board to continue to defer its ruling on the motions for summary judgment. In its November 19, 2010 order, however, the Board denied PEDP's motion for summary judgment. However, the Board tabled a ruling on BIE's motion for summary judgment and gave PEDP until December 10, 2010 to provide definitive documentation of a transaction with Harrah's, and report at the Board's December 16, 2010 meeting.

PEDP submitted documents to the Board by December 10, 2010 seeking the Board's approval for: a change of owner-

---

6. These motions were consolidated for consideration with BIE's complaint, but were eventually dismissed as moot after PEDP filed its appeal to this Court.

7. PEDP's description to the Board of its proposed project with Harrah's established that the first phase of the proposed project would consist of "an initial interim facility which is a construct of approximately 1,500 slots and 80 table games and onsite parking," and that the timeline for the final structure that fulfills PEDP's proposal was still "floating." R.R. at 5002a–5003a.

ship/control (leaving Foxwoods and Washington Philadelphia Investors, L.P., each with 1.25 percent interest in PEDP as restructured), modifications to the proposed facility, and an extension until December 31, 2012 to make 1,500 slot machines available for play. PEDP also reported to the Board at the December 16, 2010 meeting. BIE raised issues with the documents as noted in the sealed record, which related to unsigned and incomplete documentation, a shortfall of committed funds and debt financing, a dilution of PEDP's proposed commitments to charities, and anticipated additional negotiations and contingencies that included table games licensing. By order issued December 23, 2010, the Board granted summary judgment in favor of BIE, and revoked PEDP's license. The Board issued its adjudication on January 26, 2011.

On January 14, 2011, PEDP filed a petition for review with this Court, seeking review of not only the Board's December 23, 2010 order, but the November 18, 2010 order denying PEDP's motion for summary judgment, and prior, non-final discovery orders dated June 18, June 30, July 15, July 28, August 10, August 11 (order and adjudication dated the same day), August 20, and September 8, 2010.[8] Although not specifically raised in its petition for review, PEDP states in its brief that its appeal also seeks review of the Board's adjudication and order dated September 1, 2009, its adjudication and order dated February 10, 2010, and its order dated March 3, 2010.

■ Initially, we note that this Court has held that "in accordance with 4 Pa.C.S. § 1202(a)(1) of the Gaming Act, the Board has sole regulatory authority over the conduct of gaming and related activities in the Commonwealth, vesting broad discretion with the Board to administer all aspects of the gaming industry in Pennsylvania." *Rubino v. Pennsylvania Gaming Control Bd.*, 1 A.3d 976, 981 (Pa.Cmwlth.2010). Accordingly, this Court's "review of Board decisions is limited to determining whether the Board: (1) erred as a matter of law; or (2) acted arbitrarily and in capricious disregard of the evidence." *Greenwood Gaming & Entm't, Inc. v. Pennsylvania Gaming Control Bd.*, 609 Pa. 368, 15 A.3d 884, 886–87 (2011).

Section 1202(b)(12) of the Gaming Act, 4 Pa.C.S. § 1202(b)(12), specifically authorizes the Board, at its discretion, to revoke a slot machine license. Section 1207(1) of the Gaming Act, 4 Pa.C.S. § 1207, provides in relevant part:

> The board shall have the power and its duties shall be to: (1) ... revoke ... any license ... if the board finds in its sole discretion that a licensee ... *failed to comply with the provisions of* this part or *the rules and regulations of the board* and that it would be in the public

8. On January 7, 2011, PEDP filed a petition for expedited reconsideration (and a motion to protect confidential information provided therewith) based upon new circumstances, namely further progress with its deal documents, equity financing, debt financing, construction timing and charitable contributions. In light of PEDP's appeal, by order issued January 25, 2011, the Board deemed the petition moot. On March 1, 2011, the Board filed an Application for Special Relief in the Nature of a Motion to Seal the Record as to extensive background investigation information and confidential financial documents distributed throughout the certified record. By order issued March 2, 2011, this Court granted the Board's application. On March 22, 2011, the parties stipulated to supplementing the record (likewise under seal) with the Board's docket sheets, the July 29, 2010 Board hearing transcript, and the April 29, 2011 consent agreement between PEDP and the Board.

interest to ... revoke ... the license....

(Emphasis added). Section 1518(c)(1)(iii) of the Gaming Act, 4 Pa.C.S. § 1518(c)(1)(iii), specifically authorizes the Board to revoke a license on the basis of a willful and knowing violation of an order of the Board. The Board's Regulations, at Section 423a.6(b)(5), 58 Pa.Code § 423a.6(b)(5), also state:

> Failure to fully comply with any provision contained in an executed Statement of Conditions constitutes a violation of the Statement of Conditions and may result in the imposition of Board-imposed administrative sanctions, up to and including revocation, against the individual to whom the license, permit, certification or registration was issued....

(Emphasis added).

It is clear, therefore, that violating the Gaming Act or the Board's Regulations, failing to comply with the Board's orders, and even failing to comply with a Statement of Conditions, authorizes the Board to exercise its discretion to revoke a license. With that in mind we will address the merits of PEDP's appeal.

### The Financial Fitness/Suitability Standard Applied to PEDP.

PEDP first argues that the Board applied an incorrect legal test when it revoked PEDP's license on the basis of financial unsuitability, because the Gaming Act does not impose an obligation of financial suitability on Board licensees. Specifically, PEDP contends that Condition 5 of

the September 1, 2009 order created such an obligation, and it failed to define the standard. We disagree.

The parties' cross-motions for summary judgment were based upon BIE's complaint for revocation of PEDP's Category 2 License. Count II of the complaint sought revocation due to PEDP's failure to comply with Condition 5 of the Statement of Conditions it executed in consideration of the receipt of its License. Count IV of the complaint sought revocation due to PEDP's failure to maintain suitability and/or financial fitness to possess its License.

■ The Board revoked PEDP's license on the basis that, PEDP was in violation of its Statement of Conditions and the Gaming Act because it did not have "the wherewithal to develop the proposed project and the ability to maintain a steady level and growth of revenue to the Commonwealth and the demonstration by clear and convincing evidence of financial suitability, integrity and responsibility." R.R. at 6301a–6302a. PEDP argues that because Section 1313 of the Gaming Act, 4 Pa.C.S. § 1313, and Section 441a.7(f) of the Board's Regulations, 58 Pa.Code § 441a.7(f), apply to slot machine applicants,[9] the criteria set forth therein cannot form the basis for the Board's determination as to whether PEDP, as a licensee, has maintained financial suitability. PEDP's position is without merit.

Section 1313 of the Gaming Act, which is clearly applicable to slot machine applicants, provides in pertinent part:

9. Section 1103 of the Gaming Act, 4 Pa.C.S. § 1103, defines "[a]pplicant" as:

Any person who, on his own behalf or on behalf of another, is applying for permission to engage in any act or activity which is regulated under the provisions of this part. In cases in which the applicant is a person other than an individual, the Pennsylvania Gaming Control Board shall determine the associated persons whose qualifications are necessary as a precondition to the licensing of the applicant.
Section 1103 of the Gaming Act defines "[s]lot machine licensee" as "[a] person that holds a slot machine license."

(a) Applicant financial information.—The board shall require each applicant for a slot machine license to produce the information, documentation and assurances concerning financial background and resources as the board deems necessary to establish by clear and convincing evidence the financial stability, integrity and responsibility of the applicant, its affiliate, intermediary, subsidiary or holding company, including, but not limited to, bank references, business and personal income and disbursement schedules, tax returns and other reports filed with governmental agencies, and business and personal accounting and check records and ledgers. In addition, each applicant shall in writing authorize the examination of all bank accounts and records as may be deemed necessary by the board.

. . . .

(e) Applicant's operational viability.—In assessing the financial viability of the proposed licensed facility, the board shall make a finding, after review of the application, that the applicant is likely to maintain a financially successful, viable and efficient business operation and will likely be able to maintain a steady level of growth of revenue to the Commonwealth pursuant to section 1403 (relating to establishment of State Gaming Fund and net slot machine revenue distribution). Notwithstanding any provision of this part to the contrary, an applicant that includes a commitment or promise to pay a slot machine license fee in excess of the amount provided in section 1209 or a distribution of terminal revenue in excess of the amounts provided in sections 1403, 1405 (relating to Pennsylvania Race Horse Development Fund) and 1407 (relating to Pennsylvania Gaming Economic Development and Tourism Fund) shall not be deemed a financially successful, viable or efficient business operation and shall not be approved for a slot machine license.

(f) Additional information.—In addition to other information required by this part, a person applying for a slot machine license shall provide the following information:

(1) The organization, financial structure and nature of all businesses operated by the person, including any affiliate, intermediary, subsidiary or holding companies, the names and personal employment and criminal histories of all officers, directors and key employees of the corporation; the names of all holding, intermediary, affiliate and subsidiary companies of the corporation; and the organization, financial structure and nature of all businesses operated by such holding, intermediary and subsidiary companies as the board may require, including names and personal employment and criminal histories of such officers, directors and principal employees of such corporations and companies as the board may require.

(2) The extent of securities held in the corporation by all officers, directors and underwriters and their remuneration in the form of salary, wages, fees or otherwise.

(3) Copies of all management and service contracts.

In addition, Section 441a.7(f) of the Board's Regulations states that a slot machine applicant's demonstration of suitability at a licensing hearing,

must include a showing of:

(1) Good character, honesty and integrity in compliance with section 1310 of the act (relating to slot machine license application character requirements).

(2) Financial fitness in compliance with section 1313 of the act (relating to slot

machine license application financial fitness requirements).

(3) Operational viability, including:

(i) The quality of the proposed licensed facility, and temporary land-based facility, if applicable, including the number of slot machines proposed and the ability of the proposed licensed facility to comply with statutory, regulatory and technical standards applicable to the design of the proposed licensed facility and the conduct of slot machine operations therein.

(ii) The projected date of the start of operations of the proposed licensed facility and any accessory uses such as hotel, convention, retail and restaurant space proposed in conjunction therewith. Applicants shall provide the Board with a time line on the deliverability of proposed temporary land-based or phased permanent licensed facilities and the accessory uses proposed in conjunction therewith.

(iii) The ability of the applicant's proposed licensed facility to generate and sustain an acceptable level of growth of revenue.

Moreover, the Board's Suitability Report, under the Financial Suitability section thereof, indicates that the Board must make an affirmative determination that the applicant is "likely to maintain a financially successful, viable, and efficient business operation, and will likely be able to maintain a steady level and growth of revenue to the Commonwealth." R.R. at 107a. In order for the Board to make a determination, as specifically noted in the Financial Suitability section, the Suitability Report states that the Board:

> is required to assess the financial suitability of an applicant prior to granting a slot machine license. The financial suitability of the applicant encompasses an assessment of an applicant's historical financial stability and financial where-

withal to develop the proposed project. In addition, financial suitability assessment includes the proposed project's ability to maintain a steady level and growth of revenue to the Commonwealth.

R.R. at 106a. As to financial wherewithal, the Suitability Report reflects that "[t]he financial wherewithal of an applicant is measured by its ability to develop the proposed project and also includes the ability of an applicant to secure debt or obtain financing." R.R. at 111a. It is clear, therefore, that as an applicant for a Category 2 License, PEDP was required to demonstrate financial fitness, its likelihood of maintaining a financially successful, viable and efficient business operation, and its likelihood of maintaining a steady level of growth of revenue to the Commonwealth.

The record reflects that PEDP met that standard as an applicant. The Board's Bureau of Corporate Compliance and Internal Controls Financial Suitability Task Force "expended approximately 224 hours conducting a financial analysis of [PEDP] and evaluating its financial suitability for licensure." R.R. at 100a–101a. According to the Suitability Report, the Task Force specifically

> performed an evaluation of [PEDP's] financial suitability by analyzing historical financial measures (*past financial performance* and *financial risk profile*) that are indicators of an applicant's financial stability. The Task Force also considered [PEDP's] *individual key employee qualifiers* and its *financial wherewithal* for developing its proposed slot machine gaming facility ... as well as the proposed project's potential *ability to maintain and grow revenue* for the Commonwealth

R.R. at 107a (emphasis added). As to PEDP, the Suitability Report provides that PEDP "has demonstrated its financial

wherewithal to develop the proposed casino . . . ." R.R. at 111a.

At the November 14, 2006 licensing hearing, Foxwoods' CEO stated on the record that "[i]n terms of financial strength, [PEDP was] very, very solid. . . . on a solid foundation." R.R. at 201a. The Task Force represented to the Board that, "[b]ased on the information contained in the application and the financial suitability analysis performed, the task force is not aware of any financial suitability issues that would preclude licensure of [PEDP] as a Category 2 slots operator." R.R. at 258a.

The aforementioned provisions of the Gaming Act, the Board's Regulations and the Suitability Report do make clear what the Board's considerations at that point in time are, relative to slot machine applicants. Although those particular statements are not specifically applicable to licensees, PEDP's claim that once it became a licensee, it was no longer bound by those standards is absurd.

The requirement for PEDP, as a licensee, to maintain ongoing financial suitability is clear. First, the Gaming Act and the Board's Regulations make clear that PEDP must maintain financial suitability even after being licensed. Section 1202(b)(9) of the Gaming Act, 4 Pa.C.S. § 1202(b)(9), makes it the Board's specific duty "[t]o require background investigations on applicants, *licensees,* principals, key employees or permittees under the jurisdiction of the board." The Board is also mandated by the General Assembly to "[p]rescribe and require periodic financial reporting . . . for all *licensed entities.*" 4 Pa.C.S. § 1207(3) (emphasis added).

Section 421a.1(f) of the Board's Regulations states:

An applicant for a license . . . shall have a continuing duty to inform the Board of changes in the information supplied to the Board in or in conjunction with the original or renewal application. [A] *holder of a license . . . shall have a continuing duty to inform the Board of a change in circumstances that may render the . . . holder of a license . . .* ineligible, unqualified or *unsuitable to hold a license . . .* under the standards and requirements of the act and of this part.

58 Pa.Code § 421a.1(f) (emphasis added). Section 421a.2 of the Board's Regulations also provides:

(a) . . . a license . . . may be . . . revoked if:

(1) The applicant [for issuance or renewal of a license] has failed to prove to the satisfaction of the Board that the applicant or any of the persons required to be qualified, are in fact qualified in accordance with the act and with this part.

(2) The . . . *holder of a license . . .* violated the act or this part.

(3) The . . . *holder of a license . . .* is disqualified under the criteria in the act.

(4) The . . . *holder of a license . . .* has materially departed from a representation made in the application for licensure or renewal.

(5) The . . . *holder of a license . . .* has failed to comply with [f]ederal or state laws or regulations.

(b) A . . . revocation of a license . . . may be made for a sufficient cause consistent with the act and the public interest.

58 Pa.Code § 421a.2 (emphasis added). Section 421a.3(a) states: "The Board may make an inquiry or investigation concerning . . . [a] *holder of a license . . .* as it may deem appropriate *either at the time of the initial application or at any time thereafter.*" 58 Pa.Code § 421a.3(a) (emphasis added). Even independent of the Board, the BIE is required to "[c]onduct

reviews of a licensed entity as necessary to ensure compliance" with the Gaming Act, which review "may include the review of accounting, administrative and financial records ... utilized by a licensed entity." 4 Pa.C.S. § 1517(a.1)(6).

Second, PEDP's Suitability Report for PEDP specifically stated: "Suitability investigations of all applicants *and licensees* will be ongoing." R.R. at 101a (emphasis added). Introduction Subsection c of the Suitability Report provides that PEDP "agreed and continue[s] to agree to ... [p]romptly provide updated and supplemental information to comply with the current *and* ongoing suitability requirements." R.R. at 101a (emphasis added).

Third, the Board awarded PEDP its License, subject to a Statement of Conditions. Condition 5 of the Statement of Conditions placed upon PEDP's License award requires PEDP to exercise due diligence to ensure that it meets *and maintains* suitability requirements of the Gaming Act, "including but not limited to, those relating to ... financial fitness." R.R. at 578a (emphasis added). Based upon the foregoing, it is clear that the Gaming Act, together with the Board's Regulations, PEDP's Suitability Report, and PEDP's Statement of Conditions imposed; that PEDP was placed on notice of its obligation of financial suitability as both a slot machine license applicant, and a slot machine licensee.

Under the aforementioned circumstances, the Board did not commit reversible error by applying the same financial suitability test used to determine PEDP's eligibility as a slot machine license applicant to determine that it violated the conditions as a licensee.

*The Financial Fitness/Suitability Standard Is Not Vague.*

■ PEDP next argues that if the evidence of record did not establish PEDP's financial fitness and suitability as a licensee to the Board's satisfaction, then the financial fitness and suitability requirements are unconstitutionally vague as applied and cannot form the basis for revoking PEDP's license because reasonable minds could differ as to what is required. We again disagree. This Court has held:

> a statute or regulation is unconstitutionally vague if it a) traps the innocent by failing to give a person of ordinary intelligence reasonable opportunity to know what it prohibits so that he may act accordingly or b) results in arbitrary or discriminatory enforcement in the absence of explicit guidelines for its application.

*Krichmar v. State Bd. of Vehicle Mfrs., Dealers and Sales Persons*, 850 A.2d 861, 865 (Pa.Cmwlth.2004). This Court pointed out, however, that "the language may be interpreted in the context of the common knowledge and understanding of members of a particular profession in deciding if a statute or regulation is specific." *Id.*

While it would have been helpful if the General Assembly and the Board specifically defined "financial suitability" in Section 1103 of the Gaming Act, the fact that they did not do so does not render the concept undefined or otherwise indecipherable to PEDP. Section 441a.7(f)(2) of the Board's Regulations states that a slot machine applicant's/licensee's demonstration of suitability at a licensing hearing must include a showing of "[f]inancial fitness in compliance with section 1313 of the act...." Section 1313(e) of the Gaming Act requires that an applicant/licensee is likely to maintain a financially successful, viable and efficient business operation and will likely be able to maintain a steady level of growth of revenue to the Commonwealth.

The Suitability Report expressly stated: "The financial suitability of the applicant encompasses an assessment of an applicant's historical financial stability and financial wherewithal to develop the proposed project. In addition, financial suitability assessment includes the proposed project's ability to maintain a steady level and growth of revenue to the Commonwealth." R.R. at 106a. As to financial wherewithal, the Suitability Report reflects that "[t]he financial wherewithal of an applicant is measured by its ability to develop the proposed project and also includes the ability of an applicant to secure debt or obtain financing." R.R. at 111a. In addition, Condition 5 of the Statement of Conditions placed upon PEDP's License award requires PEDP to exercise due diligence to ensure that it meets and maintains suitability requirements relating to financial fitness. Also, the Board has stated to PEDP that it wanted to see PEDP's ability to build and operate the casino for which it provided the License. *See* R.R. at 4930a–4931a. Even PEDP's counsel conceded to the Board at the October 27, 2010 argument on the summary judgment motions that what the term financial suitability meant to him was does PEDP "have the wherewithal to continue to bring about the project we licensed you for?" R.R. at 4915a. Finally, in *Station Square Gaming, L.P. v. Pennsylvania Gaming Control Bd.,* 592 Pa. 664, 927 A.2d 232 (2007), the Pennsylvania Supreme Court stated that, when assessing financial suitability of an applicant, it is appropriate to consider that entity's current and future financial posture.

This Court can glean that "financial fitness/suitability," as that term is used by the Board, requires a factual showing of a licensee's historical financial stability and financial wherewithal, the latter of which is represented by its ability to develop the proposed project and to maintain a steady level and growth of revenue to the Commonwealth. Even more simply stated, PEDP merely had to demonstrate that it could construct and operate the gaming facility for which the Board awarded it the License. Moreover, the financial fitness/suitability standard was sufficiently known to PEDP. Not only was the meaning of financial fitness and suitability gleaned by PEDP, the Board repeatedly told PEDP precisely what the Board needed to see.

After PEDP sought its first extension in May of 2009, the Board held a hearing that provided PEDP the opportunity to show that it could meet the Board's requirements. Having recognized the difficulty PEDP experienced, the Board, in its September 1, 2009 order, gave PEDP a very detailed roadmap of exactly what it expected from PEDP, and the time frame in which it was required. R.R. at 1337a–1339a. Then, at the March 3, 2010 rule to show cause hearing, the Board afforded PEDP the opportunity to show that it could meet the Board's requirements. PEDP presented specific evidence that it found a solid investor in Wynn and assured the Board that, even though it still had not timely met the Board's requirements, given enough time, it would. This time, since the Board did not find good cause for the delay, it fined PEDP, but still gave PEDP an extension to supply definitive documents of the Wynn deal. At the end of the March 3, 2010 hearing, the Board specifically reiterated what it wanted from PEDP and the time frame in which it was required. Specifically, the Board stated: "we need the architectural renderings of the facility, and we would need the timeline for the construction of the facility." R.R. at 1687a. At the Board's meeting that same day, with PEDP's counsel in attendance, the Board's

proposed March 3, 2010 order was read into the record. It stated, in pertinent part: "[PEDP] shall submit definitive financing documents to the Board and to the OEC by March 31, 2010. . . . [PEDP] shall submit documents required by Conditions Five and Six of the Board's September 1, 2009 Order no later than April 26th, 2010. R.R. at 1709a–1710a. The March 3, 2010 order ultimately issued by the Board stated likewise. R.R. at 1748a.

By the deadline, PEDP timely supplied documents pertaining to the Wynn deal, but they were not yet reflective of a final deal. Although definitive documents of the Wynn deal were submitted a few days after the deadline, the Board nonetheless accepted them. When the Wynn deal fell through, PEDP admitted that it could not construct and operate the gaming facility for which the Board awarded PEDP its License without an investor, so it sought another extension for time to find a new investor and to provide definitive documentation of its ability to develop the proposed project. Once again, the Board granted an extension to supply the specific documentation it sought from PEDP in its September 1, 2009 and March 3, 2010 orders.

During the time period within which BIE filed its complaint, discovery was conducted and the parties filed their cross-motions for summary judgment, PEDP was able to find another potential investor in Harrah's. Despite the fact that argument before the Board in October of 2010 was exclusively for the purpose of summary judgment, the Board nevertheless listened as PEDP described its proposed deal with Harrah's and agreed to table its consideration of the motions, thereby affording PEDP an opportunity to present definitive documentation of the Harrah's deal. The Board held its decision as to BIE's motion for summary judgment,

again granting an extension until its November 18, 2010 meeting for PEDP to submit definitive documents of its plan with Harrah's, thereby once again advising PEDP specifically what and when specific documents were required. R.R. at 4954a–4955a.

At the November 18, 2010 meeting, PEDP admitted that a final deal with Harrah's had not been reached. The Board again held its decision on the BIE's motion for summary judgment, advising PEDP that the Board specifically needed, as to the Harrah's deal by December 10, 2010, "applications submitted to Licensing, with Notice of Intent to transfer[,] the Petition for Change of Control, all documents that would support that petition . . . the tentative financing documents . . . any structural changes within the organization . . . [and] a petition to modify the facility." R.R. at 1526a–1527a, 5016a–5017a.

By the deadline, PEDP timely supplied documents of the Harrah's deal, but they were not yet reflective of a final deal, and even if they were, PEDP admitted it would require yet another extension through December of 2012, because it could not meet the Board's May 29, 2011 deadline for having 1,500 slot machines available for public play. Again PEDP admitted that it had not timely met the Board's requirements, but assured the Board that, given enough time, it would. The Board refused to grant PEDP any more time.

It does not appear that PEDP had any difficulty understanding what the Board meant by financial suitability at the time it made application for its slot machine license. Without any apparent doubt or question about that phrase, it provided the Board with information to demonstrate that it could build and operate the casino it proposed, and that the success and growth of the proposed operation would provide revenue, jobs and charitable giving that

would be a benefit to the Commonwealth and its citizens.

PEDP had no apparent difficulty with the clarity of the Board's expectations after being awarded the License and executing the Statement of Conditions. What PEDP fails to acknowledge is that the reason it has not established its financial fitness and suitability to the Board's satisfaction is not because what is required is unclear, but because PEDP has not supplied the documents requested by the Board. Even in review of PEDP's brief, it is readily apparent that PEDP recognizes what it must show the Board regarding its financial suitability—it simply seeks more time to provide it. Accordingly, PEDP's attempt now to claim that it cannot possibly determine what the Board requires by that standard is most disingenuous, particularly under circumstances in which PEDP has touted its principals' long and successful history and experience conducting gaming in the United States.

What the Board required of PEDP relative to its financial fitness and suitability was not vague. It is clear that PEDP's difficulty meeting the Board's guidelines was not due to its lack of clarity regarding the Board's requirements, but to its ability to timely deliver. Therefore, we discern no error in the Board's rejection of PEDP's claim that the suitability standard is unconstitutionally vague as applied.

### PEDP Was Afforded Due Process.

■ PEDP finally argues on appeal that it has a valuable property right in its License, and the Board violated PEDP's due process rights where: (1) it entered summary judgment against PEDP without conducting an evidentiary hearing and reviewing the evidence in a light most favorable to PEDP; (2) the Board's determination was not supported by the record; (3) the Board denied PEDP discovery neces-

sary to support its motion for summary judgment; and, (4) the Board imposed an excessive sanction. We disagree.

Section 405a.3(a)(3) of the Board's Regulations, 58 Pa.Code § 405a.3(a)(3), authorizes the OEC within the BIE to "[i]nitiate, in its sole discretion, proceedings for violations of the act or this part by filing a complaint ... with the Board seeking ... revocation of a license ..." pursuant to Section 493a.2 of the Board's Regulations, 58 Pa.Code § 493a.2. Section 405a.6(a) of the Board's Regulations, 58 Pa.Code § 405a.6(a), states that the OEC may initiate a complaint where "sufficient facts exist to support enforcement action against a person holding a license ... issued by the Board...." Section 493a.10(b) of the Board's Regulations, 58 Pa.Code § 493a.10(b), specifically provides: "After the pleadings are closed, but within a time so that the hearing is not delayed, a party may move for summary judgment based on the pleadings and depositions, answers to interrogatories, admissions and supporting affidavits."

■ This Court has held "Summary judgment is appropriate only when, after examining the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Guy M. Cooper, Inc. v. E. Penn Sch. Dist.*, 903 A.2d 608, 613 (Pa. Cmwlth.2006). "An appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion." *Firetree, Ltd. v. Dep't of Gen. Servs.*, 978 A.2d 1067, 1072 n. 5 (Pa.Cmwlth.2009). Summary judgment is an appropriate method by which to revoke a license. *See Bowalick v. Dep't of Educ.*, 840 A.2d 519 (Pa. Cmwlth.2004); *see also B.T. v. Dep't of Public Welfare*, 828 A.2d 436 (Pa.Cmwlth. 2003). Thus, if after examining the record

in a light most favorable to PEDP, there is no genuine issue of material fact, the filing of the complaint and the subsequent motion for summary judgment were permissible means by which the Board could revoke PEDP's License.

■ PEDP's due process rights were not violated. "The threshold inquiry in any due process analysis is whether there exists any identifiable property or liberty interest at issue; for without such an interest, due process is not applicable." *Stone & Edwards Ins. Agency, Inc. v. Dep't of Ins.,* 161 Pa.Cmwlth. 177, 636 A.2d 293, 302 n. 28, *aff'd,* 538 Pa. 276, 648 A.2d 304 (1994). The Gaming Act, the Board's Regulations and PEDP's Statement of Conditions reflect that PEDP's License has been deemed by the General Assembly and the Board a revocable privilege.[10]

■ Nonetheless, the General Assembly has declared: "No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard." 2 Pa.C.S. § 504. Moreover, "[g]overnment licenses to engage in a business or occupation create an entitlement to partake of a profitable activity, and therefore, are property rights." *City of Phila. Bd. of License & Inspection Review v. 2600 Lewis, Inc.,* 661 A.2d 20, 22 (Pa.Cmwlth.1995); *see also Young J. Lee, Inc. v. Dep't of Revenue, Bureau of State Lotteries,* 504 Pa. 367, 474 A.2d 266 (1983). Thus, some form of due process is required when an administrative agency revokes one's right to transact business in the Commonwealth. This Court has held, however:

> While Section 504 mandates that a party receive an opportunity to be heard, that opportunity does not require the equivalent of an evidentiary hearing in every case. This Court has held that where no factual issues are in dispute, no evidentiary hearing is required under 2 Pa.C.S. § 504. Where there are no disputed facts, the motion proceedings, including briefs and arguments by both parties, provide ample opportunity for the parties to be heard and the Administrative Agency Law requires no more.

*Manor v. Dep't of Pub. Welfare,* 796 A.2d 1020, 1028 n. 11 (Pa.Cmwlth.2002) (citations omitted).

It is undisputed in this case that PEDP was on notice of the potential revocation of its license for some time. As early as February 10, 2010 when the Board denied PEDP's November 2009 motion for extension, and imposed a rule to show cause upon PEDP to show "why the Board should not levy further sanctions, including revocation of its license, for failure to comply with the Board's September 1, 2009 order," PEDP was on notice of the poten-

---

10. Section 1102(7) of the Gaming Act, 4 Pa. C.S. § 1102(7), specifically states that a slot machine license is a privilege. Section 421a.1(a) of the Board's Regulations, 58 Pa. Code § 421a.1(a), specifically states: "A license ... issued by the Board is a revocable privilege. No person holding a license ... is deemed to have any property rights related to the license...." Also, in its adjudication awarding the Category 2 license to PEDP, the Board states:

> The grant and issuance of this Category 2 license does not give ... [PEDP] a property right and the [Board] may, at its discretion,

revoke or suspend the license of ... [PEDP] if the [Board] finds that ... [PEDP] ... [has] not complied with the conditions of the license, the provisions in the Act, or the [Board's] regulations, and that it would be in the best interest of the public to revoke or suspend the slots license.

R.R. at 576a–577a. Finally, the Statement of Conditions placed upon PEDP's License, which were agreed to by PEDP, provides specifically that it is a "non-transferable privilege to engage in activities regulated by the Board." R.R. at 578a.

tial revocation of its license. R.R. at 1551a.

It is also an undisputed matter of record that PEDP had many opportunities to be heard. Throughout this process of PEDP's repeated requests for extensions of time to comply with the Board's orders, it attended numerous hearings and Board meetings during which it was given opportunities to present evidence and to supply the Board with the information necessary to demonstrate its compliance with the Gaming Act, the Board's Regulations and the Statement of Conditions. Then, relative to its motion for summary judgment, and in response to the BIE's motion for summary judgment, PEDP submitted briefs and participated in oral argument.

Relative specifically to the Board's grant of summary judgment without a hearing, this Court has held that an evidentiary hearing is not required before entry of summary judgment under circumstances in which no factual issues are in dispute. *United Healthcare Benefits Trust v. Ins. Comm'r of Pennsylvania*, 152 Pa.Cmwlth. 549, 620 A.2d 81 (1993). "Where there are no disputed facts, the motion proceedings, including briefs and arguments by both parties, provide ample opportunity for the parties to be heard and that Administrative Agency Law requires no more." *Id.* at 83.

In this case, the Board's determination was supported by undisputed facts of record. The parties' cross-motions for summary judgment were based upon BIE's complaint for revocation of PEDP's Category 2 License. Counts I and III of that complaint sought revocation of PEDP's License due to PEDP's failure to comply with the Board's September 1, 2009 and/or March 3, 2010 orders, and due to PEDP's inability to have a minimum of 1,500 slot machines available for play by May 29, 2011. As stated previously, Section 1518(c)(1)(iii) of the Gaming Act authorizes the Board to revoke a license on the basis of a willful and knowing violation of an order of the Board. PEDP argues that because its failure to comply with those orders was not willful and knowing, the Board cannot revoke its license on that basis. Neither the Gaming Act nor the Board's Regulations define the terms "willfully" or "knowingly." However, Black's Law Dictionary defines "willful" as "[v]oluntary and intentional, but not necessarily malicious." *Black's Law Dictionary*, 1737 (9th ed.2009). It defines "knowing" as "[h]aving or showing awareness or understanding." *Id.* at 950.

PEDP admitted facts supporting Counts I and III of BIE's complaint. PEDP was aware of the orders and understood the consequences of failure to comply with said orders. While it claims to have made every effort to comply with the orders, it did not do so, and whether or not its failure was voluntary, its repeated requests for deadline extensions reflects an intention to bypass the established deadlines. Good faith effort is not mentioned in the Gaming Act or the Board's Regulations as a basis for which PEDP can escape the provisions of Section 1518(c)(1)(iii). Because there are undisputed facts of record to support Counts I and III of the complaint, the Board did not err by granting summary judgment on those facts without a hearing.

Count II of the complaint sought revocation due to PEDP's failure to comply with Condition 5 of the Statement of Conditions it executed in consideration of the receipt of its License. Count IV of the complaint sought revocation due to PEDP's failure to maintain suitability and/or financial fitness to possess its License. PEDP admitted that it became incapable of financing the project as originally proposed to the Board, that its proposed deal with Wynn fell through, and that it had a proposed

deal with Harrah's that differed from its initial application which was not yet final as of the time the Board revoked its license. These material facts are not in dispute. What PEDP here deems disputed issues of material fact that require the Board to deny BIE's motion for summary judgment relate to (1) why it failed to meet the Board's reporting deadlines, and (2) how close it was to finalizing a deal with Harrah's. Neither argument presents a factual dispute that would preclude summary judgment.

As to PEDP's efforts to comply with the Board's orders, it is its lack of compliance and not the reasons therefor that are relevant to the complaint for revocation. However, even if efforts were sufficient to excuse a licensee's compliance with an order of the Board, PEDP's efforts in this case were placed on the record at numerous hearings and Board meetings for more than a year. Based upon PEDP's representations, the Board granted PEDP repeated opportunities to demonstrate compliance. That the Board exercised its discretion to revoke the license in spite of PEDP's efforts does not make said efforts material, render them in dispute, or require the Board to deny summary judgment.

As to evidence of PEDP's proposed deal with Harrah's, PEDP avers that, given the opportunity at a hearing, it would prove it could make a viable deal with Harrah's suitable to the Board. As PEDP has argued repeatedly, it clearly has the ability to attract potential financial backing. Originally, it obtained financing from Foxwoods, and subsequently it obtained financing from Wynn. PEDP claims that this is a sufficient basis on which the Board can rely that, with Harrah's it will eventually be able to construct and operate the gaming facility, albeit not the one for which the Board awarded PEDP its License. However, that PEDP has a proposed deal with Harrah's is not a fact material to the Board's specific consideration of BIE's motion for summary judgment based upon its revocation complaint. Certainly, no hearing is necessary to again show that a proposed deal exists or that it differs from PEDP's original proposal to the Board. PEDP has done that repeatedly. In addition, having a proposed deal does not satisfy the Board's orders, since a proposed deal, as was seen with the Wynn proposal, can fall through. Despite all of the opportunities provided by the Board, even in light of a significant fine and threat of revocation, PEDP failed to satisfy the conditions of its License.

■ In addition, despite PEDP's representations to the contrary, PEDP was afforded meaningful discovery. Although, "[a]s a general rule, discovery as provided by the rules of civil procedure [is] not available in administrative proceedings[,]" limited discovery is permitted in Board proceedings at the discretion of the presiding officer. *Pennsylvania Bankers Ass'n v. Pennsylvania Dep't of Banking,* 981 A.2d 975, 997 n. 18 (Pa.Cmwlth.2009). Section 493a.11(a)(2) of the Board's Regulations, 58 Pa.Code § 493a.11(a)(2), provides that the Board, *via* a presiding officer, has the discretion to grant discovery by the following methods: "(i) Written interrogatories[,] (ii) Depositions[,] (iii) Affidavits[,] (iv) Production of documents or things[, and] (v) Requests for admissions." The Board's Director of Hearings and Appeals, Linda S. Lloyd, issued a discovery order dated June 18, 2010, which allowed the parties to conduct discovery related to BIE's complaint for revocation.

PEDP's claim that, despite the June 18th order, subsequent orders left it with little information concerning what the Board considered the standard for evaluating PEDP's financial fitness and suitabili-

ty, is without merit. According to the record, depositions were conducted by PEDP in which BIE investigators Morace and Dobbins, who evaluated PEDP's financials, were specifically asked about the Board's standard for evaluating PEDP's financial fitness and suitability. The investigators were able to articulate their understanding of what was meant by financial fitness and suitability. *See* R.R. at 3260a (Morace), 3299a (Dobbins). That PEDP did not care for their answers does not make the discovery process afforded to it meaningless or prejudicial.

Moreover, PEDP's claim that it was afforded no discovery concerning the Board's treatment of similarly-situated licensees, while accurate, does not rise to the level of error under the circumstances. PEDP sought files related to the Board's dealings with PITG Gaming, LLC (PITG). According to PEDP's motion for summary judgment,

> to the extent that the financial fitness and suitability provisions of the Gaming Act may be deemed to pass constitutional muster ... the Board must find that PEDP has maintained financial fitness and suitability consistent with the Board's decision in In re Joint Application of PITG Gaming, LLC and Holdings Acquisition Co., L.P. for Approval of the Reorganization, Change of Control and Recapitalization of PITG Gaming, LLC and Other Relief Connected Therewith, OHA Docket # 42028....

R.R. at 2651a. In PITG, however, PITG was granted a slots license and began construction. At a point when it was apparent PITG was experiencing financing difficulties, steel for its proposed facility had been erected, and approximately $107 million had been spent on the project. PITG brought to the Board documentation that would continue the project as originally approved by the Board, but with a change

of ownership and financing. It is clear that PITG's experience and the Board's handling of that matter is distinguishable from PEDP's circumstances. We also note that the documents PEDP sought *via* discovery were either deemed irrelevant or confidential. *See* PEDP Br. at Apps. D–M; *see also* 4 Pa.C.S. §§ 1206(f), 1207(2) and 58 Pa.Code § 493a.11(d). Notably, despite PEDP's repeated efforts to maintain the confidential nature of its record in its own case, it fails to recognize PITG's right to the same confidentiality.

Finally, revocation was not an excessive sanction under these circumstances. PEDP argues that revocation of its $50 million License as a result of its purported noncompliance was an unreasonably harsh sanction, when lesser sanctions were available and would have sufficed. Certainly, as PEDP points out, lesser sanctions are favored where they achieve the agency's objective. *See Ake v. Bureau of Prof'l & Occupational Affairs, State Bd. of Accountancy,* 974 A.2d 514 (Pa.Cmwlth.2009). In this case, however, a lesser sanction in the form of a daily $2,000.00 fine was imposed for more than a year, but, even together with the threat of revocation, it did not result in the achievement of the Board's objectives in PEDP's case. Accordingly, the Board did not violate PEDP's due process rights by revoking PEDP's license *via* summary judgment without a hearing. The Board's determination was supported by the record, it did not deny PEDP discovery in support of its motion for summary judgment, nor was revocation excessive under the circumstances presented.

Under circumstances in which the Board neither erred as a matter of law, nor abused its discretion, and after having viewed the evidence of record in a light most favorable to PEDP, and there being no genuine issue of material fact, this Court will not reverse the Board's grant of

summary judgment in favor of BIE. Therefore, we affirm the December 23, 2010 final order of the Board.[11]

## ORDER

AND NOW, this 10th day of November, 2011, the December 23, 2010 final order of the Pennsylvania Gaming Control Board granting summary judgment in favor of the Board's Bureau of Investigation and Enforcement and revoking PEDP's Category 2 Slot Machine License is affirmed.

## CONCURRING OPINION BY Judge LEAVITT.

I concur in the result. I write separately because summary judgment cannot be granted except where the facts material to the judgment are not in dispute. Here, the statutory standard requiring a licensee to be financially fit and suitable is one that requires factual findings and, thus, is beyond the reach of summary judgment.

Philadelphia Entertainment and Development Partners (PEDP) asserted that it was financially fit and suitable to hold a license to build a Category 2 casino. The Bureau of Investigation alleged that it was not and sought to revoke PEDP's license on that ground. PEDP admitted that its proposal was not the same as when it was first granted a license, but this admission did not mean that PEDP was no longer financially fit or suitable to hold a license. The dispute about PEDP's financial fitness and suitability required the Gaming Control Board (Board) to make findings of fact and, thus, a revocation on this ground could not be made on summary judgment.

On the other hand, the Board had other grounds to revoke PEDP's license, *i.e.,* failure to comply with the Board's orders of September 1, 2009, and March 3, 2010.[1] The September 1, 2009 order required PEDP to do the following:

5. Within 3 months ... submit ... all architectural renderings, artist renderings, conceptual proposals, engineering opinions, any and all other documents relating to *construction of a facility, substantially similar to that approved by the Board* on December 20, 2006. The submissions must provide for a minimum of 1,500 slot machines available for play, on or before May 29, 2011....

6. Within 3 months ... submit ... a timeline for commencement and completion of all phases of development regarding its facility with a minimum of 1,500 slot machines available for play, on or before May 29, 2011....

*See* Reproduced Record at 1338a (emphasis added). PEDP's failure to meet these conditions is a fact not in dispute. Nor is it disputed that the final proposal by PEDP was not substantially similar to that which was approved by the Board on December 20, 2006. Accordingly, summary judgment on PEDP's undisputed failure to

---

11. In light of this holding, this Court need not specifically rule upon the following: the Board's November 18, 2010 order denying PEDP's motion for summary judgment; its prior, non-final discovery orders dated June 18, June 30, July 15, July 28, August 10, August 11 (order and adjudication dated the same day), August 20, and September 8, 2010; its adjudication and order dated September 1, 2009 and February 10, 2010; or its order dated March 3, 2010.

1. The Board also appears to have revoked PEDP's license for failure to comply with the Statement of Conditions placed upon it after it was granted its Category 2 license, which required PEDP to, *inter alia,* comply with all orders of the Board and maintain its financial suitability. *See* Reproduced Record at 578a.

comply with the Board's orders was appropriate.

I would affirm the Board's grant of summary judgment to revoke PEDP's license for one reason: its undisputed failure to comply with the Board's orders of September 1, 2009, and March 3, 2010.

Judge BROBSON joins in this concurring opinion.

### DISSENTING OPINION BY Judge McCULLOUGH.

I respectfully dissent. As noted in Judge Leavitt's Concurring Opinion, the Pennsylvania Gaming Control Board's Bureau of Investigation sought to revoke the Category 2 Slot Machine License (License) issued to Philadelphia Entertainment and Development Partners, L.P. (PEDP) on the basis that PEDP was no longer financially fit or suitable to hold the License. PEDP's financial fitness and suitably were vigorously disputed by the parties and the Pennsylvania Gaming Control Board (Board) was required to make factual findings in order to resolve this dispute, thereby precluding a revocation of PEDP's License by way of summary judgment. Indeed, the Majority recognizes that summary judgment is only appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Guy M. Cooper, Inc. v. E. Penn Sch. Dist.,* 903 A.2d 608 (Pa.Cmwlth.2006).

Moreover, as counsel for PEDP noted at argument, by revoking PEDP's License, PEDP will be required to forfeit a $50 million licensing fee paid to the Board. By affirming the Board's final order, the Majority, in essence, confirms the application of a summary forfeiture process with regard to a sizable property interest ($50 million fee), without a hearing. Summary forfeiture proceedings in other contexts have been disfavored for some time as unfair, unduly harsh and unconstitutional. *Mazzo v. Board of Pensions and Retirement,* 531 Pa. 78, 611 A.2d 193 (1992); *In re Adoption of M.T.T.,* 467 Pa. 88, 354 A.2d 564 (1976); *Commonwealth v. Cox,* 161 Pa.Cmwlth. 589, 637 A.2d 757 (1994); and *Commonwealth v. 502–504 Gordon Street,* 147 Pa.Cmwlth. 330, 607 A.2d 839 (1992), *affirmed,* 535 Pa. 515, 636 A.2d 626 (1994). I believe those decisions are applicable here and accordingly, I would reverse the Board's final order and remand the case for an evidentiary hearing.