J-S74041-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JONATHAN RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 466 EDA 2019 |

Appeal from the PCRA Order Entered February 8, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009673-2010

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:            **FILED JANUARY 21, 2020**

Appellant Jonathan Rodriguez appeals from the Order entered in the

Court of Common Pleas of Philadelphia County on February 8, 2019, denying

his first petition filed pursuant to the Post Conviction Relief Act (PCRA).[1]  We

affirm.

A prior panel of this Court reiterated the trial court's summary of the

relevant facts and procedural history herein as follows:

> Police Officer Kober testified that on [March] 26, 2010, at
> approximately 12:50 A.M., he went to "B" and Stella Streets in
> Philadelphia in response to a report of shots fired. When he arrived
> at the scene, he observed a male, later identified as fifteen (15)
> year old William Lyons, lying on the sidewalk at the bottom of the
> steps of a Chinese store at 3037 "B" Street. He saw that the male
> had been shot in the right side of his head. (Notes of Testimony,
> October 13, 2011, pages 58–67, 96).

---

[*] Former Justice specially assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.

Police Officer Ramos testified that at approximately 12:50 A.M. on [March] 26, 2010, he was responding to a police radio call of shots fired. As he crossed the intersection of "B" Street and Elkhart Streets, he observed a black male, later identified as Perry Smith, lying on the sidewalk at the southwest corner of the intersection. Officer Ramos exited his patrol car and saw that the male had a gunshot wound to the chest. Officer Ramos and Police Officer Ginion placed Smith in their patrol car and took him to Temple Hospital. (N.T., *id*., pages 102—107). Lyons survived. Smith died.

While at the scene, Officer Ramos was approached by Emmanuel Rivera. Rivera inquired as to Lyons' condition. Rivera told Officer Ramos that "they shot at us." Rivera described one (1) of the males involved as light skinned black male, approximately six (6) feet tall, wearing a black hat and black shirt. He described two (2) other males as being Hispanic, one of which had his hair in braids. He told Officer Ramos that the males ran westbound on Elkhart Street. Officer Ramos put out flash information to find the three (3) males. Officer Ramos turned Rivera over to Officer Kober. Rivera told Officer Kober that he had been with Lyons. Officer Kober had Rivera transported to East Detectives. (N.T., *id.*, pages 6869, 107—109, 111-112).

Meghan Macklin testified that on March 26, 2010 at approximately 12:50 A.M., she was driving in the area of "B" and Stella Streets with her boyfriend Robert Lombardo, looking to buy drugs. She saw four (4) to five (5) males standing in front of a Chinese store. One of the males yelled out that he had drugs to buy. She pulled her vehicle over on the west side of "B" Street across from the Chinese store and got out of her vehicle. She walked up to the Chinese store and told one of the males, who appeared to be fourteen (14) or fifteen (15) years old, (later identified as Emmanuel Rivera), that she wanted to buy seven (7) bags of heroin. Rivera ran across the street. She did not see exactly where he went.

As she was waiting for Rivera to return, she saw two (2) males inside the Chinese store, (later identified as William Lyons and Perry Smith). Lyons came out of the store with a pack of cigarettes. One of the males standing in front of the store asked him for a cigarette. As Lyons was taking a cigarette out of the pack, the male who had asked him for a cigarette, pulled out a black handgun, held it up to Lyons' neck and attempted to take the whole pack of cigarettes from Lyons. Ms. Macklin heard the male call out to "B" or "D" to "watch his back." Another male that was standing in front of the store, pulled out a black handgun. She

heard at least two (2) gun shots. She saw that Lyons was bleeding from his head and saw him collapse in front of the Chinese store. Smith ran up "B" Street toward Allegheny Avenue. She heard more shots fired and saw Smith run ten (10) to fifteen (15) feet and then collapse and start to convulse. She then saw the two (2) males who were shooting and a third male wearing a white shirt, run in the opposite direction that Smith ran, down "B" Street. Ms. Macklin ran back to her vehicle, got into the passenger side and drove away. After she left the scene, Mr. Lombardo called for an ambulance. (Notes of Testimony, October 14, 2011, pages 3–28, 37).

Approximately ten (10) hours later, Macklin contacted the police. She told the police that she had seen a shooting in the area of "B" Street and Allegheny Avenue. Macklin and Lombardo were taken to police headquarters and gave statements regarding the incident. Macklin was asked to look at photographs. She identified the photo of Lyons as the male that had the pack of cigarettes in his hand. She identified the photo of Emmanuel Rivera as the young male who ran across the street to get the heroin. She identified a photo of Smith as the male she saw collapse and convulse. (N.T., *id.*, pages 37-46).

The next day at approximately 12:10 P.M., Macklin was again interviewed by police regarding the incident. After viewing photo arrays, she identified all three (3) Defendants. She identified a photo of co-defendant Nelson Vazquez, as the male she saw approach Lyons with a gun. She identified a photo of co-defendant Marco Sanmarco as the male that had been standing next to her and who had pulled out the second gun and had fired shots at Lyons and Smith. She identified [Appellant] as the third male she saw running away with Vazquez and Sanmarco. She testified that [Appellant], Vazquez and Sanmarco were the males standing together in front of the Chinese store when she pulled up in her vehicle and that they had been together the whole time she was present on the scene. (N.T., *id*., pages 47–66).

The Commonwealth played a video tape of the incident. Macklin testified that the incident as portrayed in a video tape was an accurate depiction of what occurred on the night of the incident. (N.T., *id*., pages 191–194).

Officer Thomas Fitzpatrick testified that on March 30, 2010, he was assigned to serve arrest warrants for [Appellant], Nelson Vazquez and Marco Sanmarco. He went to 305 Indiana Avenue in Philadelphia to arrest [Appellant]. After breaching the door, he found [Appellant] hiding in a closet of the back bedroom on the second floor. He then went to 2937 Mutter Street to arrest Nelson

Vazquez. Vazquez was found sleeping in the front bedroom on the second floor. Officer Fitzpatrick then went to 3928 Bennington Street to arrest Marco Sanmarco. Sanmarco was not at that location. [Appellant] and Vazquez were arrested and taken to the Homicide Unit. (Notes of Testimony, October 17, 2011, pages 4, 6, 10–19).

Emmanuel Rivera testified that he was thirteen (13) years of age on the date of the incident. He testified that he was standing outside the Chinese store with Lyons and Smith. He saw [Appellant], Vazquez and Sanmarco walk up together and go into the Chinese store. He testified that he was "hustling" (selling drugs) with Lyons. He had just met Smith that same night. He testified that he knew "Baze" (Sanmarco) and "Boobie" ([Appellant]), for a long time and that he knew "Moyo" (Vazquez) for four (4) months. (N.T., *id*, pages 61–62).

Rivera further testified that, a woman came up to him and asked for six (6) bags of "dope" (heroin). He went across the street to an alleyway where he kept the heroin. When he was coming back towards the Chinese store, he saw Sanmarco patting Smith's pockets and Smith fighting with Sanmarco. He saw that [Appellant] and Vazquez both had guns in their hands. He did not see Sanmarco with a gun. He heard two (2) gunshots that he believed came from the gun that [Appellant] was holding. He ran up Stella Street and hid behind a truck. After a few minutes, he ran back down Stella Street to check on Lyons. When he got to the corner of "B" and Stella Streets, he saw that the police had arrived on the scene. He asked a policeman on the scene if Lyons was still there. The policeman took Rivera to the police district. (N.T., *id*., pages 62–75).

Rivera was interviewed by Detective Aitkin. Rivera testified that he lied at first, when he told the detective that he did not know who was present at the time of the shooting, because he was scared. (N.T., *id*., page 76).

When interviewed at the Homicide Division, Rivera identified all three (3) defendants from photos. On the [sic] Vazquez's photo he wrote "Moyo" and "shooter." On Sanmarco's photo, he wrote "Baze" and "went in Perry's (Smith's) pockets" and on [Appellant's] photo he wrote "Boobie" and "shooter." Rivera told the detectives that he was standing outside the "chino" store on B Street with Lyons and Smith. Boobie, Baze, and Moyo came up to them and asked if the store sold cigarettes. They went into the store. At that point, a woman approached them and asked for six (6) bags of "dope." He ran across the street into an alleyway to get the dope. When he came out of the alleyway, he saw Baze

taking a pack of cigarettes from Perry. He saw Baze hitting Perry and "checking his pockets." He saw [Appellant] shooting at Perry. He saw Moyo shooting in the direction of Lyons and Perry. Rivera was then shown a video wherein he identified himself, the woman who approached him to buy drugs and Lyons. (N.T., *id.*, pages 77–92, 229-232).

Robert Lombardo testified that on March 26, 2010, he drove with Meg[h]an Macklin, his ex-girlfriend, to "B" and Stella Streets in Macklin's mother's SUV to buy drugs. Macklin parked the SUV across the street from a Chinese store. He could see five (5) males standing outside the Chinese store. He identified one of the males as Vazquez. He saw Macklin walk across the street and start talking to the males. He saw one of the males he described as being "young," run across the street and into an alley. He saw one of the other males go into and then exit the Chinese store. He then saw Vazquez holding a silver revolver. He saw another male pull out a gun. He saw Vazquez shoot the gun and then saw a male fall on the sidewalk. He saw Vazquez fire the gun again. He saw Macklin run back across the street. He then saw the two (2) males who had fired guns and another male running away. (N.T., *id*. pages 138–147).

Macklin returned to the SUV, and jumped into the passenger's seat. Lombardo drove the SUV away from the scene and reported the shooting to the police. Later that morning, Lombardo called the police again. Lombardo and Macklin were taken to police headquarters to be interviewed. (N.T., *id*., pages 149–151, 153).

Lombardo was interviewed by homicide detectives a second time on March 27, 2010, at approximately 12:05 P.M. At this interview, he was shown photographs and asked if he recognized anyone in the photos. He identified Vazquez as one [of] the males that had pulled out and had fired the gun. (N.T., *id*., pages 161–163).

Police Officer Brian Stark, assigned to the crime scene unit testified that he was called to the scene by the homicide unit. He recovered a 9-millimeter fired cartridge casing from the step of 3035 "B" Street which was next door to the Chinese store. He observed [a] blood-like substance appearing on the sidewalk from the front steps of the Chinese store to the curb line. (Notes of Testimony, October 18, 2011, pages 38–43, 51–53).

Dr. Gary Lincoln Collins testified that he is the acting Deputy Chief Medical Examiner for the Philadelphia Medical Examiner's Office. He reviewed the autopsy report and photos of the autopsy performed on Smith, a toxicology report and examined the

clothing Smith was wearing. He testified that the autopsy was done by Assistant Medical Examiner, Dr. Chase Blanchard[,] who is on extended family medical leave due to injuries she received as the result of a car accident. Dr. Collins testified that he was able to render an independent expert opinion as to the cause and manner of death of Smith. Dr. Collins opined that the cause of death was multiple gunshot wounds to Smith's torso and that the manner of death was homicide. (N.T., *id*., pages 96, 101, 104–105).

Dr. Collins testified that Smith sustained two (2) penetrating gunshot wounds to his abdomen or torso and that two (2) projectiles were recovered from his body. Dr. Collins testified that Smith sustained one (1) entrance wound to the right upper abdomen and a second entrance wound lower down his torso just across from his belly button. Dr. Collins opined that the weapon that fired the shots was positioned from six (6) inches to within two and one-half (2 1/2) feet away from Smith. (N.T., id., pages 106–107).

Dr. Collins testified that both of the wounds Smith suffered were fatal, but not instantly fatal. Dr. Collins testified that the toxicology report showed that Smith had PCP in his system at a level where he would be "high" at the time he was killed. The two (2) bullets recovered from Smith's body during the autopsy were turned over to the police department by the medical examiner's office. (N.T., id., pages 115–120, 225).

Officer Raymond Andrejcak of the Firearms Identification Unit testified that he examined the evidence recovered in this case: one (1) Remington 9-millimeter luger fired cartridge casing was recovered from the scene and two (2) .38 caliber/9-millimeter bullets were recovered from Smith's body. Officer Andrejcak testified that the bullets were fired from the same firearm, either a .38 caliber or a 9-millimeter. However, he was unable to determine if the firearm that ejected the fired cartridge casing was the same gun that fired two (2) bullets. (N.T., *id*., pages 227, 230–231, 239–243).

*Commonwealth v. Rodriguez*, No. 407 EDA 2014, unpublished

memorandum at 1-7 (Pa.Super. filed February 21, 2014).

Following a jury trial, Appellant was convicted of second-degree murder, conspiracy to commit robbery, robbery and aggravated assault.[2]    On December 2, 2011, Appellant was sentenced to a term of life imprisonment without the possibility of parole for the second-degree murder conviction and concurrent terms of incarceration of ten (10) years to twenty (20) years each for the conspiracy and robbery convictions. No further penalty was imposed for aggravated assault.

Appellant filed a post-sentence motion on December 7, 2011, and the sentencing court denied it without a hearing on January 6, 2012. Appellant filed a timely notice of appeal on January 31, 2012, and this Court affirmed his judgment of sentence on February 21, 2014.   On March 20, 2014, Appellant filed a petition for allowance of appeal with the Pennsylvania Supreme Court, and the Court denied the same on August 21, 2014.

On December 31, 2014, Appellant filed a petition under the PCRA *pro se*, and he later filed *pro se* supplemental petitions on September 23, 2016, and on June 20, 2018.  Counsel was appointed on January 13, 2016, and filed an amended petition on December 20, 2016, wherein he incorporated all allegations set forth in the previous petitions and added an additional allegation pertaining to trial court's error in failing to call an alibi witness.

---

[2] 18 Pa.C.S.A. §§ 2502(b), 903(a)(1); 3701(a)(11); 2702(a), respectively.

Counsel later filed supplemental PCRA petitions on November 16, 2017, and on July 17, 2018.

On January 9, 2019, the PCRA court issued a Notice of its intent to dismiss Appellant's PCRA petition without holding a hearing pursuant to Pa.R.Crim.P. 907(1). In response, Appellant filed *pro se* a "Notice to Counsel of Issue to be Added to PCRA Amended Petition." In its Order entered on February 8, 2019, the PCRA court dismissed Appellant's petition, and this timely appeal followed.

On February 14, 2019, the PCRA court issued its Order directing Appellant to file a statement of the errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied on February 22, 2019.

In his appellate brief, Appellant presents the following Statement of Questions Involved:

> I.    Did [PCRA] court err in denying [A]ppellant an evidentiary hearing when [A]ppellant raised a material issue of fact that trial defense counsel was ineffective in failing to call known alibi witnesses?
>
> II.   Did [PCRA] court err in denying [A]ppellant an evidentiary hearing when [A]ppellant raised a material issue of fact that trial defense counsel vitiated [Appellant's] right to testify in his own defense at trial?

Brief for Appellant at 2.

Both of Appellant's issues allege trial counsel's ineffectiveness for failing to present testimony at trial. This Court's standard and scope of review of claims challenging trial counsel's advocacy is as follows:

- 8 -

This Court's standard of review regarding an order denying a petition under the PCRA is whether the determination of the PCRA court is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record.

***Commonwealth v. Grayson***, 212 A.3d 1047, 1051 (Pa.Super. 2019) (citation omitted).

We begin with a presumption that Appellant's counsel was effective. ***Commonwealth v. Williams***, 557 Pa. 207, 227, 732 A.2d 1167, 1177 (1999). Therefore, [t]o establish a claim of ineffectiveness, Appellant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." ***Commonwealth v. Turetsky***, 925 A.2d 876, 880 (Pa.Super. 2007) (citation omitted), *appeal denied*, 596 Pa. 707, 940 A.2d 365 (2007). A petitioner must establish (1) that the underlying claim has arguable merit; (2) that counsel lacked a reasonable basis for his action or inaction; and (3) but for the act or omission in question, the outcome of the proceedings would have been different. ***Commonwealth v. Washington***, 592 Pa. 696, 927 A.2d 586, 594 (2007). "A claim of ineffectiveness may be denied by a showing that the petitioner's evidence fails to meet any of these prongs." ***Id.*** (citation omitted).

In addition, we have explained:

[A] claim has arguable merit where the factual averments, if accurate, could establish cause for relief. ***See Commonwealth***

- 9 -

*v. Jones*, 583 Pa. 130, 876 A.2d 380, 385 ( [Pa.] 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim ..., he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043-44 (Pa.Super. 2019), *appeal denied*, 216 A.3d 1029 (Pa. 2019).

Further, a PCRA petitioner is not automatically entitled to an evidentiary hearing on his petition. A PCRA petition may be dismissed without a hearing if the PCRA court "is satisfied from [its review of the petition] that there are no genuine issues concerning any material fact and that the [petitioner] is not entitled to post-conviction collateral relief, and no purpose would be served by any further proceedings." Pa.R.Crim.P. 907(1).  However, when the PCRA petition raises material issues of fact, the PCRA court "shall order a hearing." Pa.R.Crim.P. 908(A)(2). Thus, "[t]o obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a

hearing." **Commonwealth v. Paddy**, 609 Pa. 272, 292, 15 A.3d 431, 442 (2011) (quotations and citations omitted).

Appellant first argues his trial counsel was ineffective for declining to present the testimony of two alibi witnesses, namely his mother and one of his brothers. Brief for Appellant at 5. Appellant maintains counsel had been aware of the witnesses as he served a notice of alibi on the Commonwealth. Appellant claims that he had been prejudiced by trial counsel's failure to call known alibi witnesses because counsel provided conflicting reasons to "different people" for not calling the witnesses. **Id**. at 8. Specifically, Appellant asserts counsel "told the trial court that because of a language problem he believed that the witnesses would not hold up to cross examination. Counsel told [Appellant's] family that they could not testify because they were family." **Id**. at 9. Appellant baldly adds:

> The trial court's assertion that [Appellant] waived this issue because he agreed with counsel not to call the alibi witnesses is erroneous because it is trial defense counsel who decides and decided not to call these witnesses and counsel already decided not to call them and the record shows that [Appellant] had difficulty understanding English but counsel failed to request a Spanish interpreter for [Appellant] to conduct the colloquy. As to this language problem with the witnesses counsel could have gotten a Spanish interpreter for these witnesses and there would have been no language problem. As to the alibi witnesses being family members, there is no proscription baring [sic] family members from being alibi witnesses and where else are you going to be at 12:50 am [sic] except at home with your family.

**Id**.

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and

prejudice requirements of the **Strickland** [**v. Washington**, 466 U.S. 668 (1984),] test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. To demonstrate **Strickland** prejudice, a petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. A failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy.

**Commonwealth v. Sneed**, 616 Pa. 1, 22-23, 45 A.3d 1096, 1108–09 (Pa. 2012) (some citations omitted). Herein, counsel's decision not to call the aforementioned alibi witnesses was a matter of trial strategy.

Where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests. A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued. A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued.

**Sneed**, at 19–20, 45 A.3d at 1107 (citations and quotation marks omitted).

Following our review of the record, we find Appellant's general allegations of trial counsel's ineffectiveness fail to satisfy the aforementioned standard, for he has not shown that the testimony of his mother and brother would have been beneficial to his defense. To the contrary, as Appellant acknowledges, **see** Brief for Appellant at 9, during a colloquy with the trial

court, Appellant heard the reasoning behind counsel's decision not to call alibi witnesses on his behalf and answered "no" when asked by the court if he wished to present alibi evidence:

***

[DEFENSE COUNSEL]: Your Honor, one other thing before we get there, there was notice of alibi given and statements were provided to the District Attorney. I have made a tactical decision not to use either one of those alibi witnesses; as a matter of fact, neither one of them is here today.

One would have been his brother who is Ricardo Rodriguez. Ricardo Rodriguez called me this morning. He said he was very ill…and the other alibi was his mother, Iris Medina, who we already heard by stipulation. She is not here because she could not stay. She went back to work.

I chose not to use the alibi with regard to his mother, Iris Medina, on the basis that because of a language problem, she had a great deal of difficulty understanding the concept of reputation evidence. It would have been even more difficult getting her through an explanation of alibi.

THE COURT: Well, did she provide an alibi for him?

[DEFENSE COUNSEL]: She did provide the alibi for him but I was not confident that she could deal with the cross-examination and I did not, as I say, want to take the risk of putting her on.

A far as the brother is concerned, that was the same consideration and I chose not use the brother as well. Now that [Appellant] is testifying, it is his call. It is against my advice but it is his decision.

THE COURT: Do you want alibi evidence presented?

[APPELLANT]: No.

THE COURT: Are you sure about that?

[APPELLANT]: Yeah.

***

- 13 -

N.T. Trial, 10/24/11, at 166-168.

It is axiomatic that "[a] defendant who voluntarily waives the right to call witnesses during a colloquy cannot later claim ineffective assistance and purport that he was coerced by counsel." *Commonwealth v. Lawson*, 762 A.2d 753, 756 (Pa.Super. 2000), *appeal denied*, 566 Pa. 638, 762 A.2d 753 (2000). As Appellant expressly agreed to counsel's strategy at the time of trial and has failed to show how an alternative strategy would have afforded him a beneficial result, this claim is meritless.

Appellant next maintains trial counsel was ineffective for advising him not to testify in his own defense, because such advice prevented him from presenting a viable defense that he was not present at the time of the shooting. Brief for Appellant at 14-15. Appellant argues counsel never informed him he had a right to testify with the assistance of an interpreter and that such failure resulted in the violation of his right to effective assistance of counsel guaranteed under the federal and state constitutions. *Id*. at 13-17.

"[T]he appropriate standard for assessing whether a defendant was prejudiced by trial counsel's ineffectiveness regarding the waiver of his right to testify is whether the result of the waiver proceeding would have been different absent counsel's ineffectiveness, not whether the outcome of the trial itself would have been more favorable had the defendant taken the stand."

***Commonwealth v. Walker***, 110 A.3d 1000, 1005 (Pa.Super. 2015) (emphasis omitted), *appeal denied*, 633 Pa. 756, 125 A.3d 777 (2015).

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

***Commonwealth v. Smith***, 181 A.3d 1168, 1179 (Pa.Super. 2018) (citation omitted), *appeal denied*, 193 A.3d 344 (Pa. 2018). It is noteworthy that "[a] defendant will not be afforded relief [on an ineffective assistance of counsel claim] where he voluntarily waives the right to take the stand during a colloquy with the court, but later claims that he was prompted by counsel to lie or give certain answers." ***Commonwealth v. Lawson***, 762 A.2d 753, 756 (Pa.Super. 2000).

During the aforementioned colloquy, the trial court repeatedly questioned Appellant regarding his right to testify:

> \*\*\*
> THE COURT: Do you understand that you have the right to choose not to testify and you have the right to choose to testify, that is your decision in the end?
>
> [APPELLANT]: Yes.
>
> THE COURT: Did your attorney discuss with you the good points and bad points about whether or not you should testify?
>
> [APPELLANT]: Yes, he did, ma'am.
>
> THE COURT: Did he give you his advice?

- 15 -

[Appellant]:  Yeah.

THE COURT:  Did you make your own decision?

[Appellant]:  I did.

THE COURT:  What is that decision?

[APPELLANT]: I will take the stand.

[DEFENSE COUNSEL]:  You want to testify?

THE DEFENDANT: Yeah. I wasn't sure at first but now I changed my mind.

THE COURT: You have the right to do whatever you want.

                           …

THE COURT:  You are going to testify though?

[APPELLANT]:  Yeah.

THE COURT:   If you are going to testify, we will put him up before the jury comes out.

        (Whereupon, a pause is taken from the proceedings)
                           …

[APPELLANT]: I don't want to testify.

THE COURT: You don't want to testify?
        Mr. Rodriguez, you indicated that you wanted to testify and when we put you on the witness stand, you leaned over and told me that you didn't want to testify; is that right?

[APPELLANT]: Right.

THE COURT: Did anybody force you not to testify?

[APPELLANT]: No. It wasn't nobody. Nobody made me. It was My own decision.

THE COURT: Did anybody say anything while you were sitting there, like your codefendant sitting next to you who I saw lean over and whisper something to you? Did he tell you not to testify?

[APPELLANT]: No, he didn't tell me not to testify.

THE COURT: You are sure about that?

[APPELLANT]: Yeah.

THE COURT: If you claim that later on ten years from now, if you were found guilty—I don't know what will happen but it is not going to help you because I saw him lean over and say something to you and then you took the stand and said you didn't want to testify. So if he said anything to you, you need to say it right now. You need to make your own decision, not based on what he says to you.

[APPELLANT]: It is my own decision, Your Honor.

The COURT: This is your life. This isn't his life. Do you understand?

[APPELLANT]: Yes.

THE COURT: He has his own issues. You have to take care of yourself. Do you understand?

[APPELLANT]: Yeah.

THE COURT: Do you want to testify?

[APPELLANT]: No.

THE COURT: Are you sure about that?

[APPELLANT]: Pretty sure.

THE COURT: Did he threaten you, the Defendant sitting next to you?

[APPELLANT]: No.

THE COURT: Did he promise you anything?

[APPELLANT]: No.

THE COURT: Did he just give you his advice?

[APPELLANT]: Yeah, he told me if I am pretty sure—I'm not really sure, Your Honor.

THE COURT: What did he say to you?

[APPELLANT]: He didn't tell me nothing.

THE COURT: You just said he just said are you sure. What did he say?

[APPELLANT]: He asked me if I wanted to take the stand and I said I'm not sure but then I changed my mind. I wanted to take it but then I'm not really sure. It is my English. I understand English and all but sometimes the words will be confusing and I don't know how to answer them. I am not trying to mess up. That's all.

THE COURT: So you do or you don't want to take the stand?

[APPELLANT]: No, I don't want to take the stand.

THE COURT: You are sure about that?

[APPELLANT]: I am pretty sure, ma'am.

THE COURT: You don't want to present an alibi defense?

[APPELLANT]: No.

[DEFENSE COUNSEL]: [Appellant], just so I am clear, nobody has made you any promises, has made any threats to you or done anything whatsoever in order to influence your decision; is that correct?

[APPELLANT]: Nobody did.

[DEFENSE COUNSEL]: This is your own decision?

[APPELLANT]: My own decision.

[DEFENSE COUNSEL]: Of your own free will and choice; is that correct?

[APPELLANT]: Yeah.

N.T. Trial, 10/24/11, at 165-67; 169-74.

At no time during his colloquy did Appellant assert he had difficulty discerning the meaning of the proceedings due to a language barrier. Rather, his responses to the queries of the trial court and defense counsel were clear.

Moreover, the next day, the trial court again asked Appellant whether or not he would be testifying on his own behalf at which time he reiterated that he did not wish to testify and stated that he had made that choice pursuant to his own free will:

THE COURT: [Appellant], you had all night now to think about whether or not you want to testify. You have the absolute right to choose to testify if you want. Have you made your decision?

[APPELLANT]: Yes.

THE COURT: What is that?

[APPELLANT]: No.

THE COURT: Are you doing that of your own free will?

[APPELLANT]: Yes.

THE COURT: Did anybody promise you anything?

[APPELLANT]: No.

THE COURT: Did anybody threaten you in any way to get you not to testify?

[APPELLANT]: No.

N.T. Trial, 10/25/11 at 2-3.

It is readily apparent from the above exchanges that the trial court thoroughly colloquied Appellant on his decision not to testify on his own behalf. Appellant clearly informed the trial court that after speaking with his counsel and having had an additional evening to contemplate his choice, he did not wish to testify; no one threatened him or forced him to make that decision, and he came to that conclusion of his own free will. ***See id.***

With regard to Appellant's instant argument that a language barrier presented him from testifying, the PCRA court explained the rationale behind its denial of Appellant's PCRA petition at a brief hearing held on January 4, 2019. In doing so, the court, who also served as the trial court, stressed that Appellant had sat through and understood every aspect of the trial and unequivocally concluded that "[t]his petitioner understood English." N.T. Hearing, 1/4/19, at 9. The trial court continued as follows:

> This [c]ourt does not take any chances with that. I check at the very beginning of every case if I had any doubt that he wouldn't understand anything.
> This is at the end of the jury trial during defense's case. And during questioning by the [c]ourt were the [c]ourt asked [Appellant] why he changed his mind and why he doesn't want to say what the codefendant said to him is—and I can quote this, because I think I pulled it out of [Appellant's statement of what his codefendant said to him—"He asked me if I want to take the stand, and I said, I'm not sure. But then I changed my mind. I want to take it, but then I'm not really sure. It's my English. I understand English and all, but sometimes the words will be confused and—I don't know. Confused. I am not trying to mess up. That's all."
> There was no indication at any time that this witness could not understand English; therefore, that issue has no merit.

*Id*. at 9-10.

In light of all of the foregoing and after carefully reviewing the record, we are satisfied that Appellant made a voluntary, knowing, intelligent waiver of testimony. Consequently, his claim for ineffective assistance of counsel on this basis also fails.

Having found no merit to Appellant's issues raised on appeal, we affirm the trial court's Order denying him relief without an evidentiary hearing under the PCRA.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/20